UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|                                   |     |                               |
|-----------------------------------|-----|-------------------------------|
| IBARRA CONSULTING ENGINEERS and RAQUEL IBARRA, | § § § § | |
| *Plaintiffs*, | § § | Civil Action No. 3:21-CV-1227-X |
| v. | § § § | |
| JACOBS ENGINEERING GROUP, | § § § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is defendant Jacobs Engineering Group's (Jacobs) motion for summary judgment.  [Doc. No. 4.]  Jacobs moves for summary judgment on all of the plaintiffs' claims against it.  The Court **GRANTS** Jacobs's motion in all respects and **DISMISSES WITH PREJUDICE** the plaintiffs' claims.

### I.        Factual Background

Defendant Jacobs is an international firm that provides professional services, including consulting, technical, scientific, and project delivery for the government and private sector.  Jacobs has a longstanding professional relationship with the Texas Department of Transportation (TxDOT).   Plaintiff Ibarra Consulting Engineers (Ibarra) is an engineering consulting firm; plaintiff Raquel Ibarra (Raquel) is the sole owner and president of Ibarra.

Jacobs, Ibarra, and non-party Nathelyne A. Kennedy & Associates, L.P. (NAK) were brought together through the TxDOT Alliance Program, which is a program

established by TxDOT to connect large, so-called "legacy firms," like Jacobs, to minority-owned companies, like Ibarra and NAK, for the purpose of facilitating relationships between them.

### A. Jacobs, Ibarra, and NAK form a joint venture.

In 2014, Jacobs approached Ibarra about forming a joint venture for the purpose of seeking a contract with TxDOT. In May 2015, Jacobs, Ibarra, and NAK executed a joint venture agreement. Under the joint venture agreement, a Board of Control governed the joint venture. Each of the joint venture partners—Jacobs, Ibarra, and NAK—received one seat on the Board of Control. Day-to-day management of the services provided by the joint venture to TxDOT was to be conducted by and under the direction of a project manager, which was to be appointed by the sponsor of the joint venture, Jacobs.

Ibarra was required to perform and was fully responsible for the portion of the services rendered to TxDOT that were assigned to Ibarra in a TxDOT-issued "work authorization" approved by the Board of Control. The joint venture agreement states that it was "intended that the proportion of the Services required under [the eventual TxDOT Contract] that will be authorized and assigned to Ibarra will be approximately equal to and not less than its Participation Percentage."[1] Ibarra's Participation Percentage was 10%; Jacobs's was 80%; and NAK's was 10%.

---

[1] Doc. No. 6-13 at 8.

The joint venture agreement contemplated a partner's "default" under the contract. In addition to outside factors like bankruptcy or insolvency, default occurs when a partner

> materially breaches any of its obligations hereunder and fails to cure such breach within fifteen (15) days after written notice thereof. Material breaches include, but are not limited to, a Party's failure to provide competent and acceptable staff, failure to meet time constraints, failure to perform in accordance with generally accepted standards or in a manner satisfactory to [TxDOT], or failure to provide adequate management and supervision.[2]

The agreement also contained a merger clause, providing that "this Agreement represents the entire agreement between the Parties concerning the subject matter hereof, and it supersedes all prior negotiations, representations, [or] oral or written agreements which relate to the subject matter hereof."

### B. TxDOT executes a procurement engineering services contract with the joint venture.

The purpose of the joint venture was to submit a proposal to TxDOT on a procurement engineering project and, if selected by TxDOT, to negotiate and enter into a Professional Services Agreement with TxDOT for the project. Procurement engineering is a type of work for which TxDOT retains specialized consultants in multi-year contracts to assist TxDOT with managing "alternate delivery" procurements. Alternate delivery procurements include delivery platforms that differ from the conventional "design-bid-build" delivery, including design-build,

---

[2] Doc. No. 6-13 at 205.

design-build-finance, and design-build-finance-operate-maintain.  Alternate delivery procurements span from approximately 6 months to several years.

In August 2015, the joint venture and TxDOT entered into a procurement engineering contract (the TxDOT Contract).  The only parties to the TxDOT Contract were TxDOT and the joint venture, but all three joint venture partners—Ibarra, NAK, and Jacobs—executed the TxDOT Contract on behalf of the joint venture.

The TxDOT Contract became effective upon execution and was scheduled to terminate on September 30, 2020, unless modified in writing, extended by TxDOT, or terminated earlier in accordance with certain other provisions of the contract. Without a work authorization issued by TxDOT, the joint venture could not do any work under the TxDOT Contract.  No work was guaranteed under the TxDOT contract, but the maximum amount payable over the life of the contract was $20 million.

The TxDOT Contract was part of TxDOT's commitment to participate in the United States Department of Transportation's Disadvantaged Business Enterprise (DBE) Program.  The Program "is a legislatively mandated federal Department of Transportation program that applies to federal-aid highway dollars expended on federally assisted contracts issued" by state transportation agencies to qualifying small businesses.[3]  The goal of both agencies was to allow DBEs to "compete fairly for contracts and subcontracts financed in whole or in part with [f]ederal funds."  It is

---

[3] *See Disadvantaged Business Enterprise (DBE) Program*, U.S. DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION, available at https://www.fhwa.dot.gov/civilrights/programs/dbe/.

undisputed that both Ibarra and NAK are DBEs as defined by federal law, and that the joint venture is a "DBE Joint Venture" as defined in the TxDOT Contract.

Under the TxDOT Contract, the joint venture committed to "make a good faith effort to meet the Disadvantaged Business Enterprise goal"[4] for the contract, meaning that it would undertake "efforts . . . which, by their scope, intensity, and appropriateness to the objective, can reasonably be expected to fulfill the program requirement."[5]  The joint venture's DBE "goal" under the TxDOT contract was 11.7%.[6]  In addition to the "goal," the joint venture also made a DBE "commitment" to TxDOT that it hoped to deliver 10% of the work under the contract to Ibarra; another 10% to NAK; 6% to Seiler/Lankes Group, LLC, a Hispanic-owned sub-provider; and 2.7% to HBMG, Inc., another Hispanic-owned sub-provider.  Those hopes resulted in a total DBE "commitment" of 28.7%.[7]

The joint venture contract stated that "in performing the Jacobs Scope of Services and any additional services that may be assigned to it, Jacobs agrees to be bound to the [joint venture] and to assume toward the [joint venture] all the obligations, responsibilities, conditions, requirements, and duties that the [joint venture], by the [TxDOT Contract] or applicable laws, assumed toward or is bound toward [TxDOT]."[8]  The joint venture "agree[d] to comply with the requirements set

---

[4] Doc. No. 6-13 at 81–82.

[5] *Id.* at 81.

[6] *Id.* at 82.

[7] *Id.* at 85.

[8] *Id.* at 7.

forth in Attachment H, Disadvantaged Business Enterprise . . . Subcontracting Plan Requirements with an assigned goal or a zero goal, as determined by the State."[9]

Attachment H, in turn, provided that the joint venture would offer DBEs "the opportunity to compete fairly for contracts and subcontracts financed in whole or in part with Federal funds.  In this regard, the Provider shall make a good faith effort to meet the [DBE] goal for this contract."[10]  Furthermore, the joint venture agreed that it "shall not discriminate on the basis of race, color, national origin, or sex in the performance of this contract.  The Provider shall carry out applicable requirements of 49 CFR Part 26 in the award and administration of DOT assisted contracts."[11]

### C. Work begins slowly under the TxDOT Contract.

At TxDOT, the Director of Strategic Projects Division oversaw staff who managed or were project managers on consulting contracts like the TxDOT Contract between the joint venture and TxDOT.  During the relevant time period, the Director was Katherine Holtz.  Holtz's deputy was Kristi Flagg, who helped Holtz manage her staff.   The TxDOT staff member assigned to the TxDOT contract was Marcus Coronado, who reported directly to Flagg.

After the TxDOT agreement was executed in August 2015, the Board of Control began meeting regularly and the joint venture started submitting proposed work authorizations to TxDOT.  Things began slowly.  As of March 2016, TxDOT had rejected several proposed work authorizations, but things started looking up when,

---

[9] *Id.* at 35.

[10] *Id.* at 81.

[11] *Id.*

by June 2016, TxDOT had approved five work authorizations. (Recall that the joint venture could do no work on the TxDOT Contract without TxDOT issuing work authorizations.) Even though TxDOT was beginning to approve the joint venture's work authorizations, TxDOT also asked the joint venture in June 2016 to reduce its staff by nine people "because of a lack of work."[12]

### D. Ibarra and Raquel directly communicate with TxDOT.

Recall that, on the joint venture side, the project manager was in charge of day-to-day management of the TxDOT Contract. The project manager served as the face of the joint venture to TxDOT; this "one point of contact" method was TxDOT's preference. As Holtz, the Director of Strategic Projects Division at TxDOT, stated in her deposition: "it helps with communication so that there's not things going on somewhere else that we don't know what is going on. It's just we know who has the authority to speak for the contract."[13] Raquel acknowledges having received TxDOT's "one voice" directive on several occasions, both verbally, and in writing. Nevertheless, Raquel also stated that all of these instructions "just sounds like a piece of advice."[14]

In June 2016 and in August 2016, Raquel independently communicated with TxDOT by arranging and holding meetings with two TxDOT employees without informing the joint venture. On December 13, 2016, Raquel emailed the Board of Control and copied Holtz. Because of the recent slowdown in work, Raquel was worried that the revenue disparity between the joint venture partners would

---

[12] *Id.* at 104.

[13] Doc. No. 6-8 at 8.

[14] Doc. No. 6-1 at 39.

substantially increase.  Holtz called a meeting.  During the meeting, Ibarra asked if it could "sit in" on some meetings between TxDOT and the project manager.[15]  Holtz responded by reminding Ibarra of TxDOT's preference that the project manager "act on behalf of their contract."[16]  Holtz also explained that those meetings are "for [project managers] and TxDOT leads to catch up on status of tasks" and that TxDOT "will notify the [joint venture] of any new work, work plans and work authorizations."[17]

The next day, Raquel emailed Holtz with questions about labor classifications of Ibarra.  Holtz responded: "I am confused, is this a request from the joint venture? I would really appreciate one voice for the Joint Venture submitting requests through their program manager."[18]

One of the project managers for the joint venture (there were several over the relevant time period) recalls that Holtz had told her "more than once that TxDOT wanted a single point of contact."[19]  Holtz also visited the project manager's office to alert the project manager of a specific time when Ibarra contacted Holtz.  TxDOT was bringing to the project manager's "attention" that these communications were "inappropriate, that's not how they wanted to operate, so that became a problem."[20]

---

[15] Doc. No. 6-13 at 141.

[16] *Id.*

[17] *Id.*

[18] *Id.* at 142.

[19] Doc. No. 6-11 at 7.

[20] Doc. No. 6-10 at 6.

On January 5, 2017, the joint venture issued its first notice of default to Ibarra. The Board of Control sent a letter to Ibarra giving notice that it viewed the *ex parte* communications as violating the joint venture agreement, constituting a material breach of the joint venture agreement, and undermining the working relationship between the joint venture and TxDOT.[21]   Raquel sent a letter in response, stating that the joint venture had "mostly misrepresent[ed] the events."[22]   Raquel explained that the December 2016 meeting came about "due to Jacobs's refusal to present to [TxDOT] the work classification categories" that Ibarra wanted to submit.[23]   Raquel asked "if indeed it is Jacob's position that every time a JV partner voices a concern or does something one of the other partners disapproves it becomes a 'material breach'? One might ask how many material breaches has Jacobs committed?"[24]   Raquel said that Jacobs was "bullying," "intimidating," and "harassing" her and her firm.[25]

In April 2017, Coronado, a TxDOT employee who reported to Holtz, provided written evaluations of several work authorizations to the joint venture.   Coronado noted Ibarra's continued communications with TxDOT and "request[ed] that Ibarra coordinate with [the project manager] and not directly with TxDOT.   [The joint venture] would benefit from having a unified team presented to TxDOT."[26]   Coronado

---

[21] *See* Doc. No. 6-13 at 143.

[22] Doc. No. 28-26 at 2.

[23] *Id.*

[24] *Id.*

[25] *Id.* at 2–3.

[26] Doc. No. 6-13 at 161.

did not "appreciate a [joint venture] member (Ibarra) contacting" TxDOT leadership "without the TxDOT Program Manager being previously informed or consulted."[27]

### E. Ibarra submits deficient invoices.

Any partner (Jacobs, Ibarra, or NAK) that performed work on a work authorization would send their individual invoices to the project manager who reviewed, compiled, and sent them as a master invoice to TxDOT for payment. Ultimately, it was TxDOT's decision whether to approve or reject an invoice, or a particular line item on an invoice, and Ibarra understood that.

Ibarra was new to the invoicing process. At the beginning of work on the TxDOT Contract, a Jacobs employee who assisted the project manager with sending invoices to TxDOT provided a daylong training session to Raquel Ibarra (president and owner of the Ibarra firm) and Ibarra's Chief Operations Officer, Whitt Drewyor. In addition, the Jacobs employee provided feedback to Ibarra about Ibarra's invoices, recommending that Ibarra change certain line items before the joint venture submitted the invoice to TxDOT.

Sometimes Ibarra accepted Jacobs's suggestions; sometimes it didn't. For herself, Raquel stated at an August 2016 meeting of the Board of Control that the "invoice process is a learning experience,"[28] and later testified that "everybody has

---

[27] *Id.* at 163.

[28] *Id.* at 125.

their own style as to how they want their invoices."[29]  "Everybody is different," Raquel explained.[30]

It appears that TxDOT did not share Raquel and Ibarra's freestyle approach to invoicing.  At the same December 2016 meeting where TxDOT addressed the importance of the project manager speaking "on behalf of the joint venture," TxDOT also addressed issues with Ibarra's invoices.  For example, TxDOT explained that Ibarra's "breakdown of hours" needed to improve: "If work is work related, then it must be reported on timesheet and progress report so it doesn't read simply 'meeting with [Name.]'  Must be clear about what subject was discussed or it will be assumed [overhead]" and therefore "not covered under the Scope of Work."[31]  Jacobs revised and corrected several invoices that Ibarra submitted between September and November 2016, and TxDOT was rejecting Ibarra's invoices—meaning that people weren't getting paid.

In February 2017, the Board of Control issued its second notice of default to Ibarra, based on the invoicing issues.  The Board determined that the mistakes constituted a material breach of the joint venture agreement and warned that it would "implement remedies for default" if more problems occurred.[32]

---

[29] Doc. No. 6-1 at 29.

[30] *Id.*

[31] Doc. No. 6-13 at 139.

[32] *Id.* at 144–45.

### F.  Work picks up.

Recall that TxDOT had issued a few work authorizations to the joint venture by June 2016.  But not all was rosy, as TxDOT also asked the joint venture at that time to reduce its staff by nine people because of a lack of work.

In August 2016, James Arbuckle, a Jacobs employee, became the joint venture's new project manager.  Arbuckle told Ibarra that he would work to develop a plan to get the proportion of work assigned to Ibarra under the TxDOT Contract up to the goal level of 10 percent, but explained that the timeline was "by the time we got through with the contract," because "it was all dependent on getting task orders from [TxDOT] and working towards trying to catch up."[33]  Soon thereafter, TxDOT approved Arbuckle's plan to put Ibarra and NAK engineers on the "core team," and TxDOT issued a work authorization of which Ibarra and NAK had 40% of the budget.

Unfortunately, work again began drying up between late 2016 and early 2017. The joint venture got a new project manager, Marcelle Jones.  Then in April 2017, because of the decrease in work, TxDOT directed the joint venture to submit a "rightsizing plan" that would address the lack of work and resultant overstaffing. Ibarra and NAK declined to approve the first proposed plan, but it ended up not mattering because TxDOT rejected Jones's first plan.  On May 8, 2017, TxDOT accepted Jones's second plan; it decreased the size of the on-site staff to only nine people.  Jones told TxDOT that the right-sizing could adversely affect the DBE commitments.

---

[33] Doc. No. 6-9 at 6.

12

### G. Raquel sends a letter to TxDOT raising various complaints.

On May 16, 2017, without the joint venture's knowledge, Ibarra sent a letter to Martin Rodin, the TxDOT Professional Engineering Procurement Services Division Director.   Raquel later testified that she had first spoken with TxDOT's Chief Engineer and then with Rodin, and that Rodin asked Raquel to "put it in writing." The letter was the result.  After receiving the letter, Rodin summarized it in an email to TxDOT's Chief Engineer.  Rodin described Raquel's complaints "in a nutshell" as: (1) "Jacobs [project manager] is allowed to not be a [Professional Engineer];" (2) "TxDOT is talking only to Jacobs [Project Manager] and not the [joint venture] leadership;" (3) "Ibarra is not allowed to staff positions up to their 10% [joint venture] commitment;" (4) Ibarra invoices were rejected for "inconsistent reasons as a means of punishment;" (5) "Ibarra staff not allowed to Invoice at the correct rates;" and (6) "Ibarra staff being fully removed from [core] Team on May 19, 2017."[34]

Rodin and his staff examined the dollar commitments in all "work authorizations that had been issued, and . . . verified" that the joint venture was meeting its goals for Ibarra and NAK under the TxDOT contract.[35]   At that time, TxDOT had executed eleven work authorizations and the approximate percentage of the dollar commitments going to each joint venture partner was 68% to Jacobs, 7% to Ibarra, and 7% to NAK.  The rest had gone to DBE sub-consultants.  Thus, in total, about 31% of all committed dollars had gone to the contract's DBEs—Ibarra, NAK,

---

[34] Doc. No. 6-13 at 227–28.

[35] Doc. No. 6-7 at 4.

and the two DBE sub-consultants.  The TxDOT Contract DBE goal was 11.7% and the "commitment" was 28.7%, so the joint venture was, overall, overperforming.

In addition to reviewing the work authorizations, TxDOT referred Raquel's letter to Martha Arnold, the TxDOT DBE Program Manager and a senior TxDOT employee.  Arnold's job was to make sure there was no noncompliance with the DBE program regulations.  Arnold concluded that Raquel's letter did not raise any DBE program concerns, and that there was indeed no direct mention of DBE matters in the letter.

Although Raquel referred to Ibarra as a "minority joint venture partner" in the letter, this did not, in TxDOT's eyes, constitute a complaint about racial discrimination against minorities.   Rather, TxDOT interpreted "minority" as referring to Ibarra's status as a minority joint venture partner relative to Jacobs.  In other words, TxDOT concluded that Raquel's letter had little to do with TxDOT or the DBE program.  The letter was about internal joint venture disputes and TxDOT told Raquel as much: "The management issues identified in your letter are, for the most part, a reflection of issues within the . . . Joint Venture Team and should be resolved internally within the Joint Venture upon acceptance of the new . . . Project Manager."[36]

On June 9, 2017, the joint venture program manager informed the Board of Control about Raquel's letter and her prior meetings with TxDOT staff leading up to the letter.

---

[36] Doc. No. 28-20 at 2.

### H. The joint venture terminates Ibarra.

On August 4, 2017, the Board of Control, on behalf of the joint venture, sent a final notice of default to Ibarra. The joint venture reminded Ibarra of its prior notice of default for Ibarra's unauthorized communications and explained that Ibarra's continued communications with TxDOT—especially her meetings with TxDOT leading to the May 2017 letter and the letter itself—constituted material breaches of the joint venture agreement. The joint venture declared Ibarra in default and "[Ibarra's] participation in this Joint Venture is hereby terminated, effective immediately."[37]

## II.      Procedural Background

This case has had several iterations. The first began in August 2017, when Ibarra filed its petition in state court, alleging various state-law claims and claims for racial discrimination and retaliation under 42 U.S.C. § 1981. Jacobs removed to this Court. The case was assigned to the Honorable Sam Cummings.[38] The parties conducted discovery, then Jacobs moved for summary judgment on all claims against it.

In his order, Judge Cummings found that Ibarra had failed to demonstrate a genuine dispute of material fact precluding summary judgment on the racial-discrimination claim.[39]   Judge Cummings found that the claim was simply a

---

[37] Doc. No. 6-13 at 182–83.

[38] *Ibarra Consulting Eng'rs, Inc. & Raquel Ibarra v. Jacobs Eng'g Grp., Inc.*, Civil Action No. 3:19-cv-1437, Doc. No. 38 (N.D. Tex.).

[39] *Id.* at 2.

"repackaging" of Ibarra's breach of contract claim and that the evidence showed no genuine dispute of material fact that "Ibarra signed off on each work order submitted to TXDOT for which racial discrimination is now alleged."[40] So he dismissed Ibarra's § 1981 racial-discrimination claim with prejudice.

Judge Cummings also found for Jacobs on Ibarra's retaliation claim. "[T]here is no evidence to support that Ibarra ever made a claim for racial discrimination. . . . Thus, without a valid report of discrimination, there can be no retaliation."[41] "Finally," Judge Cummings said, "the record is clear that Raquel Ibarra's constant contacting of TXDOT officials was causing problems for the joint venture and is a legitimate, non-discriminatory reason for any action taken in response thereto."[42] So Judge Cummings dismissed with prejudice that claim as well.

After disposing of both claims that presented federal questions, Judge Cummings declined to exercise his supplemental jurisdiction over the remaining state-law claims. He remanded the case.[43]

Once the case was back in state court, the plaintiffs filed an amended petition. They deleted the § 1981 claim, maintained their other state-law claims, maintained the breach of contract claim, and expanded the breach of contract allegations by asserting for the first time that Jacobs had "failed to make good faith efforts to ensure that Ibarra" received adequate work assignments and failed to make good faith

---

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.* at 3.

16

efforts not to racially discriminate as "required" by 49 C.F.R. § 26.[44]  Section 26 guides the implementation of the federal DBE Program.[45]

In response to the plaintiffs' new allegation that Jacobs had violated a federal regulation, Jacobs again removed the case and asserted federal-question jurisdiction.[46]  The plaintiffs moved to remand; the undersigned denied the motion.[47]  Jacobs filed the instant motion for summary judgment.

## III.    Legal Standard

Courts must grant summary judgment if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[48]  A material fact is one "that might affect the outcome of the suit under the governing law."[49]  And a "dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[50]  Courts "resolve factual controversies in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[51]

---

[44] *See* Doc. No. 16 at 14–15.

[45] 49 C.F.R. § 26 (2014).

[46] Doc. No. 1.

[47] Doc. No. 25.

[48] FED. R. CIV. P. 56(a).

[49] *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

[50] *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248).

[51] *Lexon Ins. Co. v. Fed. Deposit Ins. Corp.*, 7 F.4th 315, 321 (5th Cir. 2021).

The party moving for summary judgment bears the initial burden of identifying the evidence "which it believes demonstrate[s] the absence of a genuine [dispute] of material fact," but need not necessarily support its motion with "materials *negating* the opponent's claim."[52]  The nonmoving party must "go beyond the pleadings and establish 'specific facts showing that there is a genuine [dispute] for trial.'"[53]  "Summary judgment is not foreclosed by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[54]

## IV.   Analysis

In the operative pleading, Ibarra asserts three claims and Raquel asserts one. Ibarra asserts a (1) breach of contract claim and alleges that Jacobs breached the contract in eight different ways.  Ibarra also asserts claims for (2) money had and received and/or unjust enrichment and (3) fraudulent inducement.   Raquel asserts a tortious interference with contract claim.

### A. Supplemental Jurisdiction

Ibarra and Raquel urge the Court to exercise its jurisdiction over only Ibarra's breach of contract claim based on Jacobs's alleged violation of 49 C.F.R. § 26, which is the claim that the Court previously found to provide federal jurisdiction over this case.  Ibarra and Raquel want the Court to remand the rest of the state-law-based

---

[52] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* FED. R. CIV. P. 56(c)(1).

[53] *McWhirter v. AAA Life Ins. Co.*, 622 F. App'x 364, 365 (5th Cir. 2015) (alteration in original) (quoting *Celotex*, 477 U.S. at 324).

[54] *Lexon Ins. Co.*, 7 F.4th at 322 (cleaned up).

claims for the state court to decide.  Jacobs urges the court to exercise its supplemental jurisdiction to rule on all claims.

The Court agrees with Jacobs.  At least three of the four factors outlined in 28 U.S.C. § 1367(c) governing when a district court *may* decline to exercise supplemental jurisdiction counsel against declining to do so here.  That statute allows a district court to decline to exercise its supplemental jurisdiction if "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."  The plaintiffs' state-law claims raise neither novel nor complex issues of state law, they do not predominate over the breach of contract claim based on Jacobs's alleged violations of 49 C.F.R. § 26, and there are no exceptional circumstances.

Finally, the "common law factors of judicial economy, convenience, fairness, and comity" also weigh in favor of exercising supplemental jurisdiction here.[55]  This case is over four years old and in its fourth iteration between state court and federal court.  The Court will exercise its supplemental jurisdiction over all of Ibarra's and Raquel's state-law claims.

## B. Breach of Contract Claim

Ibarra's first claim against Jacobs is for breach of the joint venture contract. Ibarra alleges that Jacobs breached the contract in eight different ways.  A claim for

---

[55] *Wilson v. Tregre*, 787 F.3d 322, 326 (5th Cir. 2015) (cleaned up).

breach of contract "requires proof of the following elements: (1) a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages sustained by the plaintiff as a result of the breach."[56]

### i.  Allocation of Work

Ibarra's first claim of breach is that Jacobs "fail[ed] to comply with the contractual provisions for the allocation of work both in amount and timeliness."[57] Ibarra argues that the joint venture contract required Jacobs to allocate to Ibarra not less than 10% of every invoice throughout the life of the contract and that Jacobs failed to do that because Ibarra was in fact not given at least 10% of every invoice (and indeed was not assigned any work at all on some of the TxDOT work authorizations).

Jacobs argues that Ibarra's claim fails for several reasons.  First, Jacobs explains that the text of the joint venture agreement did not call on Jacobs to ensure that Ibarra received not less than 10% of every invoice.  Instead, Jacobs quotes the contract itself, which says that the parties "intended that the proportion of the *Services required under [the eventual TxDOT Contract]* that will be authorized and assigned to Ibarra will be approximately equal to and not less than its Participation Percentage [10%]."[58]  According to Jacobs, Ibarra was entitled to approximately and

---

[56] *Petras v. Criswell*, 248 S.W.3d 471, 477 (Tex. App.—Dallas 2008, no pet.).  Neither side of this dispute contends that any law other than Texas law applies to the state law claims.

[57] Doc 1-1 at 20.

[58] Doc. No. 5 at 11 (emphasis added).

not less than ten percent of the "services required" *over the lifetime of the TxDOT Contract.*   "10% [was] a 'life of the contract' goal rather than a per-[work authorization], per-invoice mandate."[59]

Second, Jacobs argues that the evidence bears out the truth that the contract did not require each joint venture partner to receive its participation percentage on every single invoice.   Jacobs notes that Ibarra approved of and signed off on all eleven work authorizations that TxDOT sent during Ibarra's time in the joint venture. While Ibarra got work on five of them, it received no work on six of them.[60]   And yet Ibarra approved them all.   Moreover, on the work authorizations that assigned Ibarra at least some work, not all of them gave Ibarra at least 10% of the work.[61]   Ibarra approved those too.

Thus, Jacobs contends that Ibarra "waived" any right to contest that it was due at least 10% on every single work authorization.   "Waiver is an affirmative defense available against a party who . . . engages in intentional conduct inconsistent with claiming that right."[62]   Waiver by conduct "may be established by showing a party's prolonged silence or inaction in asserting a known right."[63]   "Courts will not find an implied waiver through a party's actions unless the intent to waive the party's right

[59] Doc. No. 5 at 35.

[60] Doc. No. 5 at 28, 36.

[61] Doc. No. 5 at 28.   For example, Ibarra received 5.18% ($20,628.74 ÷ $398,348.48) on work authorization #7.

[62] *Martin v. Birenbaum*, 193 S.W.3d 677, 681 (Tex. App.—Dallas 2006, pet. denied).

[63] *Id.*

21

is clearly demonstrated by the surrounding facts and circumstances."[64]  "Ordinarily, waiver is a factual issue, but it may be established as a matter of law when the facts and circumstances are admitted or clearly established."[65]

Here, the facts and circumstances are clearly established and undisputed that Ibarra approved the allegedly problematic invoices over a sustained period of time. Although Raquel's communications with TxDOT expressed concern about Ibarra's overall share of the work, she never said or even implied that Ibarra was supposed to get at least 10% on every single invoice.  Thus, the Court is inclined to find that Ibarra's approving all eleven work authorizations was conduct "inconsistent with claiming" a right to at least 10% on every invoice and thus, waiver.[66]

In response to this evidence, Ibarra argues that it approved the work authorizations under "duress," posits that Jacobs would have "threat[ened]" Ibarra if Raquel had requested changes to the work authorizations, and asserts that Jacobs lied to Ibarra by leading Ibarra to believe that TxDOT required fast approval.  But Ibarra submits no evidence of any such "threat*s,*" nor any evidence that Ibarra ever attempted to initiate discussions about the allocation of work on any particular work authorization or invoice, or that Ibarra refused to approve an invoice or work authorization unless and until it was granted 10% of the work.  This is an

---

[64] *Id.*

[65] *Id.* (cleaned up).

[66] *Id.*

unsubstantiated assertion the Court must reject.[67]  Jacobs has shown an absence of any genuine dispute as to any material fact on waiver.

Third, even if Ibarra did not waive its alleged right to have at least 10% of every invoice, Jacobs argues that the parties did not understand any joint venture partner to have a right to its participation percentage on every single invoice.  Jacobs cites the deposition testimony of Rodin, a Director at TxDOT.  He testified that it is normal for fewer than all joint venture partners to be on any given work authorization: "Every work authorization is different, and it uses different team members.  There's gonna be work authorizations that only Jacobs may be needed on.  There's gonna be work authorizations that—that Ibarra and NAK may only be needed on. . . .  It's just the nature of the work."[68]

Jacobs submits the deposition testimony of Ian Alderson, one of the joint venture's project managers.  Alderson testified:

> [T]he work authorizations are sometimes tied to specific tasks, and sometimes they're more of an ongoing nature.  And so at any point in time on a five-year contract, the allocation of work between the partners would be contingent on the work that has been directed in the executed work authorizations.  So in my experience working as a Program Manager [. . .] is that you try as hard as you can to make a good-faith effort to give everybody their committed share by the end of the contract.  It's not always able to do that in a perfectly linear manner.[69]

Jacobs submits the deposition testimony of Nathelyne Kennedy, whose firm (NAK) was the other DBE joint venture partner that, like Ibarra, had a 10%

---

[67] *Lexon Ins. Co.*, 7 F.4th at 322.

[68] Doc. No. 5 at 28.

[69] *Id.* at 35.

participation percentage.  Kennedy testified that she never thought that NAK would get "10 percent of [each] invoice;" rather, she viewed it as "a five-year contract and so it's my understanding that we would get 10 percent throughout, by the end of the five years."[70]  Kennedy explained: "we are prime on a lot of projects.  That's just the way— they don't always work.  They don't always work 10 percent each time there is an invoice. . . . [T]he percentages are the goal. . . . [S]ometimes it comes up to be above it, and sometimes it comes below it."[71]

Raquel Ibarra is the only individual involved with the joint venture who testified that she thought that the contract required that Ibarra get at least 10% of every invoice.  Her only basis was the contract's "Service Authorization" provision.  That provision requires that "changes in the allocation of Services among the Parties" had to be, among other things, "documented."[72]  Ibarra says in its response to Jacobs's motion for summary judgment: "If, like JACOBS would have it, JACOBS could allocate work in any amounts it wanted throughout the contract, then this provision would be meaningless since there would be no point at which 'a change' could be recognized or defined in the allocations of services to the partners."[73]  In other words, Ibarra interprets the "Service Authorization" provision as requiring an elaborate approval process every time that Ibarra was assigned anything less than 10% of any invoice.  So the "Service Authorization" provision supports Ibarra's argument only if

---

[70] *Id.* at 36.

[71] *Id.*

[72] *Id.*at 35.

[73] Doc. No. 27 at 24.

you *also* buy Ibarra's interpretation that it was entitled to at least 10% of every invoice.

But the Court doesn't buy it.  As the contract's text and the evidence reveal, these provisions refer to the "services provided" over the life of the contract.  The parties agreed to "intend[]" that Ibarra receive "approximately equal to and not less than" its participation percentage (10%) of services provided over the life of the contract.[74]  The relevant provisions do not speak of individual invoices or work authorizations; they speak in a more general sense, of "services provided" under the eventual TxDOT contract.  The parties could have agreed to more specific or different terms, but they didn't.  And, as explained above, the parties also acted as though they were entitled to their respective participation percentages over the life of the contract.[75]

Does that mean, as Ibarra contends, that the "Service Authorization" provision is rendered meaningless?  No.  It means that, if the parties wanted to "change[] the allocation of services" to which Ibarra was entitled—approximately equal to and not

---

[74] *Id.* at 11 (emphasis added).

[75] Under principles of textualism, the Court believes the contract is sufficiently clear that there is no need to resort to parole evidence like the conduct of the parties.  But given that Ibarra believes that beyond-the-contract evidence (like Raquel's testimony) helps its claim, the Court is compelled to demonstrate it does the opposite.

less than 10%—that change would have to comply with the provision's requirements.[76]

Finally, in Ibarra's petition, it alleges that "JACOBS failed to make good faith efforts [under 49 C.F.R. § 26] to ensure that IBARRA and NAK were provided specific and independent work assignments and ensure that IBARRA and NAK received 'no less than 10%' participation each."[77]  This allegation is one on which the Court based its decision to deny the motion to remand, finding that Ibarra's petition presented a federal question.

Jacobs argues that there is no genuine dispute of material fact as to this claim. Jacobs explains that the "goal" for DBE participation was 11.7% of the TxDOT Contract amount and that, near the time of Ibarra's termination, DBE participation under the contract at that point was approximately 31%.  Thirty-one percent also exceeded the DBE "commitment," which was 28.7%.  When the report showing these percentages was made, as explained above, Ibarra had received about 7% of the total contract.  In response to Jacobs's motion, Ibarra argues that Jacobs did not make "good faith" efforts under 49 C.F.R. § 26 to meet the DBE goal, the DBE commitments, or the joint venture contract's work allocation to Ibarra of "approximately equal to and not less than 10%."

Just as Jacobs successfully established an absence of a genuine dispute of material fact as to whether it breached its "inten[tion]" to give Ibarra "approximately

---

[76] *Id.* at 35.

[77] Doc. No. 1-1 at 21.

26

equal to and not less than"[78] 10% over the life of the contract, Jacobs has also successfully shown as a matter of law that it did not fail to make good-faith efforts *not to breach* as to the allocation of work. And, just as Ibarra waived its right to pursue the argument that every invoice should have given it 10%, Ibarra waived its right to pursue this argument. Approving all eleven invoices without requesting any changes is conduct inconsistent with believing that Jacobs was failing to make a good-faith effort to meet the contract's goals—whether rooted in the joint venture contract directly or, by reference or incorporation, § 26. In addition, as discussed above, Jacobs has established that the contract meant 10% over the lifetime of the contract. When Ibarra materially breached the contract (discussed below), it cut short its window to obtain 10% over the life of the contract.

No reasonable jury would conclude—contrary to the contract's text and the parties' conduct—that Ibarra was due approximately equal to and at least 10% of every invoice and/or work authorization, or that Jacobs failed to make good-faith efforts with respect to the work allocation. Thus, Jacobs is entitled to summary judgment on the allocation-of-work theory for Ibarra's breach of contract claim.

### ii.   Failure to Mentor

Ibarra's next theory undergirding its breach of contract claim is that the joint venture contract required Jacobs to "mentor" Ibarra and that Jacobs failed to do so.[79] Ibarra admits that the contract "does not specifically innumerate [sic] a duty" for

---

[78] Doc. No. 6-13 at 8.

[79] Doc. No. 1-1 at 20.

Jacobs to mentor Ibarra.  Instead, Ibarra relies on two provisions that, Ibarra says, imply a duty to mentor.  One is the "Jacobs Scope of Services Component," which states that:

> In performing the Jacobs Scope of Services [. . .] Jacobs agrees to be bound to [the joint venture] and to assume toward the joint venture all the obligations, liabilities, responsibilities, conditions, requirements, and duties that the [joint venture . . .] assumes toward or is bound to [TxDOT].[80]

The obligations that the joint venture owed to TxDOT were defined by the TxDOT Contract, which in turn allegedly incorporated at least some of the terms of 49 C.F.R. § 26.  And § 26.1 states that one "objective" of the federal DBE program is "[t]o assist the development of firms that can compete successfully in the marketplace outside the DBE program."  Ibarra says that § 26.1 imposed a duty to mentor, but Ibarra does not explain how.  Lacking any textual evidence, it is not at all clear to the Court that § 26 imposes *any* duty to mentor, much less that any such duty is imposed on Jacobs as opposed to, for example, TxDOT, as the state agency that receives the DBE program funding.

The second contractual provision that Ibarra argues imposed on Jacobs a duty to mentor is the "Defaulting Party" provision.  That provision states, in pertinent part, that a "[m]aterial breach[] include[s] . . . a Party's . . . failure to perform in accordance with generally accepted standards or in a manner satisfactory to [TxDOT], or failure to provide adequate management and supervision."[81]  Ibarra

---

[80] Doc. No. 31 at 13.

[81] Doc. No. 31 at 14.

asserts that Jacobs breached this provision but provides no evidence that Jacobs "fail[ed] to perform . . . in a manner satisfactory to [TxDOT]" or otherwise defaulted by not mentoring Ibarra.

Ibarra cites the testimony of Holtz, who testified that her "understanding" was that "part of the process" of being "DBE partners . . . would involve Jacobs mentoring Kennedy and Ibarra." Ibarra does not explain or even argue that Holtz's "understanding" was based in the contract between Ibarra and Jacobs (the joint venture contract). Standing alone, Holtz's testimony on this point is insufficient to defeat a motion for summary judgment when the contract contained a merger clause. The Court will not deny summary judgment when the contract forecloses the failure-to-mentor argument. So the Court grants summary judgment to Jacobs.

### iii.   Invoicing Issues

Ibarra's third, fourth, and fifth theories for its breach of contract claim all relate to invoicing issues, so the Court will handle them together. Ibarra alleges that Jacobs breached the joint venture contract by failing "to process Ibarra's invoices accurately and timely," by "altering Ibarra's invoices without Ibarra's approval and against requests from TxDOT," and by "delaying, failing, or refusing to pay Ibarra amounts due."[82]

However, in its response to Jacobs's motion for summary judgment, Ibarra did not mention the invoicing issues or make any argument that the Court should not grant summary judgment. Ibarra argued that the Court shouldn't grant Jacobs's

---

[82] Doc. No. 1-1 at 20.

summary judgment on its other bases for the breach of contract claim, but not as to these three.  Thus, Ibarra forfeited its claims and the Court could grant summary judgment as unopposed.[83]

Regardless, however, Jacobs deserves summary judgment because it has met its "burden of establishing the absence of a genuine [dispute] of material fact."[84] Ibarra submitted no evidence that Jacobs "altered" its invoices other than to ensure that they conformed to the billing requirements established in the TxDOT Contract (to which Ibarra agreed).  To the extent that some of Ibarra's invoices were delayed, it appears that the delay was not Jacobs's fault.  Rather, the evidence is that the delays were caused by Ibarra's own freestyling invoicing method, which did not always comply with TxDOT's requirements.  As explained above, Holtz, Ibarra, and Jacobs discussed Ibarra's recurring invoicing errors at the December 2016 meeting, and the invoicing issues served as the bases for one of the joint venture's default letters to Ibarra.

So the Court rejects the invoicing-issues basis for two reasons.  First, Ibarra did not oppose Jacobs's motion on these grounds.  Second, no reasonable jury would conclude that Jacobs breached the contract with respect to Ibarra's invoices.  Thus,

---

[83] *See United States v. Shoup*, No. 3:14-CV-4440-N-BK, 2017 WL 4535285, at *3 (N.D. Tex. Sept. 8, 2017) (Toliver, M.J.) (granting summary judgment for plaintiff on claim on which plaintiff bore burden of proof, where nonmovant "fail[ed] to respond to Plaintiff's arguments, challenge Plaintiff's evidence, or present controverting evidence of his own"), *report and recommendation adopted*, No. 3:14-CV-4440-N-BK, 2017 WL 4516453 (N.D. Tex. Oct. 10, 2017) (Godbey, J.).

[84] *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 362 n.3 (5th Cir. 1995).

Jacobs is entitled to summary judgment on the invoicing-issues basis for Ibarra's breach of contract claim.

### iv.   Racial Discrimination and Retaliation

Ibarra's sixth and seventh bases for breach of contract are that Jacobs "fail[ed] or refus[ed] to provide good faith efforts not to discriminate against Ibarra and NAK."[85]   Ibarra argues that 49 C.F.R. § 26 prohibited Jacobs from "intimidat[ing], threaten[ing], coerc[ing], or discriminat[ing] against" Ibarra "for the purpose of interfering with any right or privilege secured by [§ 26] or because the individual or firm has made a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under [§ 26]."[86]   Ibarra alleges that Jacobs breached the duties imposed by 49 C.F.R. § 26 and incorporated into the joint venture contract by discriminating and retaliating against Ibarra on the basis of Raquel's race.[87]

In its motion for summary judgment, Jacobs asserts the affirmative defense that claim preclusion and/or issue preclusion block Ibarra's racial discrimination and retaliation bases for the breach of contract claim.

Jacobs argues that Ibarra's discrimination and retaliation bases are barred by claim preclusion under Judge Cummings's prior order.   Claim preclusion has four elements: "(1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was

---

[85] Doc. No. 1-1 at 20.

[86] *Id.* (partially quoting 49 C.F.R. § 26).

[87] Doc. No. 1-1 at 18.

concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions."[88]  Here, the parties are the same, Judge Cummings had jurisdiction over the prior case, and he made a final judgment on the merits. That leaves us with only the fourth element, whether this case involves the same claim or cause of action.

"In order to determine whether both suits involve the same cause of action," the Fifth Circuit "uses the transactional test."[89]  Under this test, a prior judgment's "preclusive effect extends to all rights of the plaintiff with respect to all or any part of the transaction, or series of connected transactions, out of which the original action arose."[90]  "The critical issue is whether the two actions are based on the same nucleus of operative facts."[91]

In the prior federal case, Ibarra asserted that Jacobs had violated 42 U.S.C. § 1981 by racially discriminating and retaliating against it.   Judge Cummings rejected that claim when ruling on Jacobs's motion for summary judgment:

> Plaintiffs have failed to create a genuine issue of material fact as to any racial animus that played a role in interfering with [Ibarra's] ability to contract.  The allegations are simply a repackaging of the alleged breach of contract claims asserting that a minimum of 10% invoicing was not allotted to [Ibarra]. . . .  The evidence, as noted by Defendant, indicates that Ibarra signed off on each work order submitted to TXDOT for which racial discrimination is now alleged.   For the reasons argued by

---

[88] *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005).

[89] *Id.*

[90] *Id.*

[91] *Id.* (cleaned up).

> Defendant, Plaintiffs have failed to create a genuine issue of material
> fact as to racial discrimination or pretext.[92]

So, Judge Cummings held that Ibarra had no evidence of racial discrimination and no evidence of retaliation.

Ibarra's breach of contract claim based on racial discrimination and retaliation is precluded by Judge Cummings's prior judgment on the § 1981 claim because the two claims are indeed based on the same nucleus of operative facts—the parties' conduct during Ibarra's tenure on the joint venture.  Judge Cummings has already decided that Ibarra has no evidence of racial discrimination or retaliation, and to side with Ibarra here, the Court would have to decide that "the prior judgment was in error."[93]  And the Court has no basis to do that, so Ibarra's argument is barred.[94]

Ibarra's response is unavailing.  Ibarra argues that Judge Cummings's language that the § 1981 claim was "simply a repackaging of the alleged breach of contract claim" is "dicta" and should not be followed.[95]  First, the "repackaging" phrase isn't what Ibarra should be worried about.  Judge Cummings's holding that Ibarra had no evidence of racial discrimination or retaliation should be Ibarra's concern for res judicata purposes.  Second, Ibarra cites no legal authority explaining why anything in Judge Cummings's prior order was "dicta."  Ibarra also argues that the wider scope of § 26's prohibition on racial discrimination and retaliation means that Judge Cummings's holding on its § 1981 claim do not preclude the § 26 claim

---

[92] *Ibarra Consulting Eng'rs, Inc.*, Civil Action No. 3:19-cv-1437, Doc. No. 38 at 2 (N.D. Tex.).

[93] *Singh*, 428 F.3d at 571.

[94] *Id.*

[95] Doc. No. 27 at 31 n.40.

here.  Again, Ibarra's problem is its dearth of evidence—not which federal statute provides more protection.

"Once a movant who does not have the burden of proof at trial makes a properly supported motion, the burden shifts to the nonmovant to show that a summary judgment should not be granted."[96]  Jacobs has made a properly supported motion, but Ibarra has failed to carry its burden of "identify[ing] specific evidence in the record and . . . articulat[ing] the precise manner in which that evidence supports his or her claim."[97]  The Court concludes that Ibarra's racial discrimination and retaliation bases for its breach of contract claim are precluded by Judge Cummings's prior order.  Because the Court holds thus, it need not decide whether the bases are also barred by issue preclusion.

### v.    Termination without Justification

Ibarra's eighth and final breach of contract argument is that Jacobs "terminat[ed] Ibarra without justification and in violation of the terms of" the joint venture contract.[98]  As previewed above, the contract states that "[m]aterial breaches include, but are not limited to . . . failure to perform in accordance with generally accepted standards or in a manner satisfactory to [TxDOT]."[99]  The contract also states that a party is in default if the party "materially breaches any of its obligations hereunder and fails to cure such breach within fifteen (15) days after

---

[96] *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[97] *Id.*

[98] Doc. No. 1-1 at 20.

[99] Doc. No. 6-13 at 205.

written notice thereof."[100]   Finally, the contract empowered the Board of Control to "determine and act upon the various matters, expressly or impliedly contained in other sections of this Agreement which require decision by the Board of Control."[101]

Jacobs contends that Ibarra's unauthorized communications with TxDOT and its recurrent invoicing issues were material breaches that authorized Jacobs and NAK to expel Ibarra from the joint venture.  Judge Cummings noted in his prior order that "the record is clear that Raquel Ibarra's constant contacting of TXDOT officials was causing problems for the joint venture and is a legitimate, non-discriminatory reason for any action taken in response thereto."[102]

The Court agrees with Judge Cummings.  As explained above, TxDOT complained on multiple occasions about Raquel and Ibarra's speaking to TxDOT and not going through the program manager.  Ibarra clearly behaved "in a manner [not] satisfactory to [TxDOT]" and thus materially breached the contract.[103]   Ibarra's communications also violated the plain text of the contract, which states that "the Project Manager shall have primary responsibility for . . . contact and correspondence with [TxDOT] . . . and contact and correspondence with any third party on matters arising under [the TxDOT Contract] or this Agreement."[104]

---

[100] *Id.*

[101] *Id.* at 4.

[102] *Ibarra Consulting Eng'rs, Inc.*, Civil Action No. 3:19-cv-1437, Doc. No. 38 at 2.

[103] Doc. No. 6-13 at 205.

[104] *Id.* at 6.

Ibarra also invoiced "in a manner [not] satisfactory to [TxDOT]."[105]   As explained above, Ibarra had recurring problems with its invoicing.   TxDOT and Jacobs had to redline and edit several of Ibarra's invoices because they did not comply with TxDOT standards.   After the errors persisted, the Board of Control issued a notice of default.   The default letter reminded Ibarra of Jacobs's and TxDOT's efforts to train Ibarra and bring it into compliance with TxDOT policies.   The default letter explained that Ibarra had submitted invoices for "administrative work at senior or [project manager] labor classifications, . . . charges for non-allowable expenses, and excessive hours for invoice review."[106]   And yet Ibarra "insisted on their submission, disregarding TxDOT invoicing requirements and expectations."[107]   Those "invoices were submitted and, as forewarned, rejected by [TxDOT]."[108]   "Ibarra's repeated refusal or inability to comply with TxDOT requirements has jeopardized prompt payment to the [joint venture] partners and subconsultants [and has] caused friction with and excessive work for TxDOT staff . . . ."[109]   "[Y]our actions constitute a material breach . . . ."[110]

Importantly, it wasn't only Jacobs that decided to expel Ibarra from the joint venture.   NAK—the other DBE joint venture partner—joined Jacobs and agreed that the joint venture should terminate Ibarra.   Kennedy testified that she "knew that

---

[105] *Id.* at 205.

[106] *Id.* at 144.

[107] *Id.*

[108] *Id.*

[109] *Id.* at 145.

[110] *Id.*

36

TxDOT didn't like what was going on" with Ibarra's communications.[111]   Kennedy "agreed that Ibarra should be held in default."[112]   Specifically, Kennedy testified that Ibarra defaulted because "TxDOT didn't like it. . . .   No one was supposed to be going to TxDOT without—you know . . . without the project manager and the joint venture team."[113]

While determining if a breach is material can often be a fact-bound question, it is not here.  The parties defined material breaches to be performance that did not satisfy TxDOT.  No reasonable jury would conclude that Ibarra had not materially breached the contract and thus that the joint venture was not justified in terminating Ibarra.  Thus, Jacobs is entitled to summary judgment on the unjust-termination theory for Ibarra's breach of contract claim.

## C.   Money Had and Received Claim

Ibarra's second cause of action is for money had and received.[114]   Money had and received is an equitable doctrine designed to prevent unjust enrichment.[115]   A claim for money had and received is intended to permit a party to recover on a debt that is not based on an express contract, but rather on a contract implied by law.[116]

---

[111] Doc. No. 6-3 at 6.

[112] *Id.*

[113] *Id.*

[114] Doc. No. 1-1 at 20.

[115] *Edwards v. Mid-Continent Office Distribs.*, 252 S.W.3d 833, 837 (Tex. App.—Dallas 2008, pet. denied).

[116] *Friberg-Cooper Water Sup. v. Elledge*, 197 S.W.3d 826, 831 (Tex. App.—Fort Worth 2006), *rev'd on oth. gr.*, 240 S.W.3d 869 (2007).

"There can be no recovery under a contract implied by law, however, where a valid express contract governing the subject matter exists."[117]

Ibarra alleges that Jacobs has "compensation . . . that belongs in equity to Ibarra . . . through the [joint venture] and the [TxDOT Contract] . . . that Ibarra performed but Jacobs had yet to provide Ibarra before its termination of Ibarra."[118] Of course, as Ibarra acknowledges, the reason that Jacobs (or TxDOT) ever compensated Ibarra under the TxDOT Contract is because the joint venture contract—directly at issue here—required it to. As explained above, the joint venture contract stated that the parties intended for Ibarra to receive approximately equal to and not less than 10% of the contract amount over the lifetime of the contract. The joint venture contract's "subject matter" plainly governs Ibarra's entitlement to compensation under the TxDOT Contract. Therefore, Ibarra has "no recovery for unjust enrichment" and the Court grants summary judgment to Jacobs on this claim.[119]

### D.    Fraudulent Inducement Claim

Ibarra's third and final cause of action is for fraudulent inducement. Ibarra alleges that Jacobs "made numerous . . . material representations to induce Ibarra to enter into the [joint venture] contract for the purpose of pursuing, obtaining, and

---

[117] *Oldham v. ORIX Fin. Servs., Inc.*, No. 3:05-cv-2361-M, 2007 WL 530202, at *4 (N.D. Tex. Feb. 21, 2007) (Lynn, J.) (cleaned up) (granting summary judgment, and determining that because a contract *existed*, despite not having been breached, it would be a "perverse result" to permit equitable recovery).

[118] Doc. No. 1-1 at 22.

[119] *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000).

performing on the [TxDOT Contract]."[120]  Ibarra alleges that Jacobs promised that "Ibarra would receive no less than 10% of the [TxDOT Contract] participation" and that "Jacobs would mentor Ibarra."[121]  And Ibarra alleges that, when Jacobs made these promises, it "knew" that they were "false or made recklessly . . . . with the intent to induce Ibarra to agree to join the [joint venture]."[122]  Finally, Ibarra alleges that the false promises harmed it because it "did not receive" the promised terms "and Jacobs had no intent of providing the[] promised terms."[123]

To prove a claim for fraudulent inducement, the plaintiff must prove "(1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on and (5) which caused injury."[124]  Where a fraud claim is based on "a promise to perform in the future, in addition to the above elements, it is necessary to prove facts that the promise was made with a present intent not to perform."[125]

"[A] party's intent is determined at the time the party made the representation," but intent may also "be inferred from the party's subsequent acts

---

[120] Doc. No. 1-1 at 22.

[121] *Id.*  In its petition, Ibarra asserted two other alleged misrepresentations, but Ibarra is now pursuing only the mentoring and 10%-allocation theories.

[122] *Id.* at 22–23.

[123] *Id.* at 23.

[124] *Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 557 (Tex. 2019), reh'g denied (Oct. 18, 2019) (cleaned up).

[125] *Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 571 (Tex. App.—Dallas 1989, no pet.).

after the representation is made."[126]  Because "intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence."[127] Consequently, it "is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony."[128]

While "the mere failure to perform a contract is not evidence of fraud,"[129] failure to perform "is a circumstance to be considered with other facts to establish intent."[130]  "Slight circumstantial evidence . . . is sufficient to support a finding of fraudulent intent" "when considered with the breach of promise to perform."[131]  "[A] party's denial that he ever made a promise is [also] a factor showing no intent to perform when he made the promise."[132]

Jacobs first argues that the contract's merger clause prohibits Ibarra's claim for fraudulent inducement.  While "a statement disclaiming reliance is sufficient to waive fraud-based claims"[133] including fraudulent inducement, "pure merger clauses"[134] are generally not sufficient.  Rather, the merger clause must "express[]"

---

[126] *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986).

[127] *Id.* at 435.

[128] *Id.*

[129] *Formosa Plastics Corp.*, 960 S.W.2d at 48.

[130] *Spoljaric*, 708 S.W.2d at 435.

[131] *Id.*

[132] *Id.*

[133] *Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 178 (5th Cir. 2016).

[134] *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 334 (Tex. 2011).

clear and unequivocal intent to disclaim reliance" to "ha[ve] the effect of precluding claims for fraudulent inducement."[135]

Here, the joint venture contract stated: "This Agreement represents the entire agreement between the Parties . . . and it supersedes all prior negotiations, representations, oral or written agreements which relate to the subject matter hereof."[136]  There is no express disclaimer of reliance, so this term does not preclude Ibarra's fraudulent inducement claim.

Next, Jacobs argues that Ibarra's fraudulent inducement claim fails because Ibarra has failed to provide evidence of any misrepresentation—especially evidence of a promise that Jacobs had no intent to perform at the time the promise was made. As evidence of the required present-intent-to-not-perform, Ibarra has Raquel's deposition testimony.  Raquel testified that Jacobs's employee Greg Janes made the mentoring and no-less-than-10% promises to Raquel.  Raquel testified: "It is my belief that several of the things that were told to us when [Janes] was trying to convince us to be a joint venture partner never came to fruition.  It is our belief that their intent was for it not to come to fruition."[137]

This conclusory assertion is insufficient to defeat Jacobs's motion for summary judgment on the fraudulent inducement claim.  Raquel testified simply that she "believe[ed]" that Jacobs had no intent to mentor Ibarra or provide at least 10% of the

---

[135] *Id.*

[136] Doc. No. 6-13 at 20.

[137] Doc. No. 5 at 47.

contract amount to Ibarra. That is rank speculation, not "slight circumstantial evidence."[138]

In response to Jacobs's motion for summary judgment, Ibarra also argues that the fraudulent inducement claim should proceed because, Ibarra says, Jacobs denies ever making promises to mentor Ibarra and give Ibarra 10% of the TxDOT contract amount. As Ibarra notes, such evidence would counsel in favor of finding fraudulent inducement.[139] But Jacobs affirmatively states that it *did* intend to give Ibarra approximately equal to and not less than 10% of its "participation" in the TxDOT contract.[140] Although Jacobs does deny ever making a promise to mentor Ibarra (as discussed extensively above), Ibarra still has failed to introduce even slight circumstantial evidence that, when Jacobs allegedly promised to mentor Ibarra, Jacobs had no intent to do so.

Thus, Ibarra has failed to establish a dispute as to any material fact on its fraudulent inducement claim and Jacobs is entitled to judgment as a matter of law.

### E.    Tortious Interference with Contract

Raquel's only claim against Jacobs is for tortious interference with contract. Specifically, Raquel alleges that she "had a valid contractual relationship with Ibarra as its president and owner," that Jacobs "engaged in racially discriminatory or

---

[138] *Spoljaric*, 708 S.W.2d at 435. *Cf. Ramachandran v. Jain*, No. 3:18-CV-00811-X, 2022 WL 102612, at *5 (N.D. Tex. Jan. 11, 2022) (Starr, J.) (denying defendant summary judgment on fraudulent inducement claim where plaintiff testified that defendant's actions evinced a present lack of intent to fulfill promises by, for example, threatening economic harm if the plaintiff did not accept less favorable terms).

[139] *Spoljaric*, 708 S.W.2d at 435.

[140] Doc. No. 1-1 at 22. *See* Doc. No. 5 at 47.

retaliatory harassment and disparate treatment of" Ibarra and Raquel, and that Jacobs's behavior "damaged" Raquel's "desire to work cooperatively" with the joint venture partners.[141]  Raquel also alleges that Jacobs damaged her emotional health and wellbeing and economically harmed her.[142]

To prevail, Raquel must show: (1) the existence of a valid contract between herself and Ibarra; (2) willful and intentional interference with that contract; (3) injury proximately caused by that interference; and (4) actual damage or loss.[143]

First, Jacobs argues that Raquel has failed to show that she had a contract with Ibarra.  While Raquel admits that she has no written contract with Ibarra, she argues in response to Jacobs's motion that she nevertheless has a "terminable at-will employment contract" with Ibarra and that such an "employment relationship" can serve as the basis for a tortious interference claim.[144]

But Raquel's petition states only that she has a contract with Ibarra as its "president and owner"—not as its "employee."[145]  So that's the first problem, because "district courts do not abuse their discretion when they disregard claims or theories of liability not present in the complaint and raised first in a motion opposing summary judgment."[146]  In addition, Raquel has provided the Court with no legal authority allowing an inference that her serving as an owner makes her an employee.

---

141 Doc. No. 1-1 at 23.

142 *Id.* at 24.

143 *Cmty. Health Sys. Prof'l Servs. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017).

144 Doc. No. 27 at 47; *see also* Doc. No. 6-1 at 48 at 363:23–25, 364:1–11.

145 Doc. No. 1-1 at 23.

146 *De Franceschi v. BAC Home Loans Servicing, L.P.*, 477 F. App'x 200, 204 (5th Cir. 2012).

And Raquel has provided no evidence showing that she is in fact a "*terminable, at-will*" employee, which is what the cases cited by Raquel call for.[147]  Raquel points the Court to two pages of an exhibit that lists "Raquel Ibarra" under the heading "Employee Name" but does not otherwise explain or elaborate in any detail how or why Raquel is a terminable, at-will employee of Ibarra.[148]

Second, even if the Court were to find that Raquel has shown a valid contract with Ibarra, her claim fails for at least one other reason.  Raquel presented the Court with absolutely no evidence that she suffered "actual harm" from Jacobs's allegedly tortious interference.  In response to Jacobs's motion, Raquel states that "[i]t is reasonable to infer that Jacobs's decision to terminate Ibarra from the [joint venture] had the intended consequence of harming both Ibarra the company and Ibarra [Raquel] the person through both the immediate removal of the prospect of any additional work for the remaining scheduled three years on the TxDOT Contract as well as the reputational and personal harms to both IBARRA and Ibarra [Raquel]."  She also states that she "suffered from a loss of income due to Jacobs's intended tortious actions."

In support of these "reasonable infer[ences]," Raquel cites to no evidence, deposition testimony, affidavits, or anything else.  The party "opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim."[149]  The Court will

---

[147] *See, e.g.*, *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689 (Tex. 1989).

[148] Doc. No. 6-13 at 110–11.

[149] *Ragas*, 136 F.3d at 458.

not "sift through all the record in search of evidence."[150]   Thus, the Court grants Jacobs summary judgment on Raquel's tortious inference with contract claim.

## V.   Conclusion

The Court **GRANTS** Jacobs's motion for summary judgment in all respects.

The Court **DISMISSES WITH PREJUDICE** Ibarra and Raquel's claims.

**IT IS SO ORDERED** this 30th day of March, 2022.

_____

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

---

[150] *Id.* (cleaned up).